**COMPUTER SCIENCES CORPORATION,**
Plaintiff,

v.

**The UNITED STATES, Defendant,**

and

**Joint Test, Tactics, and Training, L.L.C., Intervenor.**

No. 01–391C.

United States Court of Federal Claims.

Originally Filed Dec. 19, 2001.

Reissued for Publication Jan. 16, 2002.

Rand L. Allen, Washington, D.C., attorney of record for plaintiff, and of counsel to plaintiff Barbara Van Gelder, Paul F. Khoury, William S. Lieth, and Eric W. Leonard. Helaine G. Elderkin, of counsel.

Franklin E. White, Jr., Department of Justice, Washington, D.C., with whom was Assistant Attorney General Robert D. McCallum, Jr., for defendant. David M. Cohen, Director. Ricke D. Hamilton, United States Air Force, of counsel.

Mark D. Colley, Washington, D.C., counsel for intervenor JT3, L.L.C.

## OPINION [1]

FUTEY, Judge.

This post-award bid protest is before the court on the parties' cross-motions for judgment on the administrative record. Plaintiff requests a permanent injunction voiding the contract at issue because it believes defendant's decision to award the procurement to Joint Test, Tactics and Training, L.L.C. (JT3) was arbitrary, capricious, an abuse of discretion and not in accordance with the law. Specifically, plaintiff argues the Source Selection Authority (SSA) unreasonably relied upon certain discriminators for the technical aspects of the submitted proposals. Plaintiff also contends defendant failed to recognize its superiority in every level of the past performance evaluation. Plaintiff maintains, therefore, that defendant's award decision was contrary to the underlying evaluation results and inconsistent with the solicitation's stated criteria.

Defendant asserts the SSA's decision to award the contract to JT3 was rational and in accordance with the law. Defendant maintains the discriminators used by the SSA were reasonable and reflected that JT3's offer represented the best value to the government. Defendant also argues the SSA rationally determined that past performance was not a significant discriminator in the procurement. JT3 asserts that its proposal was superior to plaintiff's offer and that plaintiff's attacks on the SSA's discriminators lack merit.

### Factual Background

Plaintiff, Computer Sciences Corporation (CSC), is a business organized and existing under the laws of the State of Nevada. Defendant, the United States of America, is acting by and through its agent the United States Air Force. Since it was awarded the contract at issue, JT3 is defendant-intervenor. JT3 is a joint venture between EG & G Technical Services, Inc. (EG & G) and Raytheon Technical Services Company (Raytheon). These two entities formed JT3 for the purpose of submitting a proposal for, and if successful, performing the procurement challenged in this case.[2]

### I. The J–TECH Program

At issue is Contract No. F42650–01–C–7218 (Contract) for defendant's Joint Range Technical Services (J–TECH) program. The objective of the J–TECH program is to improve the United States' Electronic Warfare (EW) capabilities through the testing and

---

1. This opinion was originally filed under seal on December 19, 2001. The parties were directed to notify the court of any portion of the opinion containing proprietary information that should be redacted prior to publication. The court also asked the United States Air Force to redact the classified information referenced throughout the opinion. The parties and the Air Force jointly submitted their proposals to the court on January 11, 2002. The court has redacted all proprietary and classified information contained in this opinion. Said redactions are indicated by asterisks within brackets ( [* * *] ).

2. Plaintiff initially was involved in the discussions to form the JT3 venture, but no agreement was reached because defendant was concerned that the teaming arrangement would be anti-competitive.

evaluation of aerospace systems and the development of new tactics in conjunction with the research, development, test and evaluation, and training missions at four ranges in the western United States. The Contract requires the awardee to provide all engineering and technical support services at these locations. Specifically, the Air Force and the United States Navy are currently operating in three western states at four ranges including: (1) the Air Force Flight Test Center, also referred to as Annex 1, located at Edwards Air Force Base, California; (2) the Nevada Test and Training Range, which is comprised of a training area known as Annex 2 [* * *]; (3) the Utah Test and Training Range, also called Annex 3; and (4) the Navy's Electronic Combat Range, known as Annex 4, located in China Lake, California. The missions performed at each of these ranges employ a wide array of sophisticated military assets, including various aircraft, "threat systems" (*e.g.*, radars, surface-to-air missiles, anti-aircraft and other air defense systems), and testing equipment. [* * *].

[* * *].

In order to carry out its missions [* * *], defendant has historically relied on a number of contractors to provide a wide variety of technical support services ranging from the operation and maintenance of testing and threat systems to the development and engineering of hardware and software systems, as well as the management and administration of various aspects of range operations, including security and quality management. Plaintiff is the incumbent technical support contractor at Annexes 1 and 3. One of its subcontractors [3] for the competition at issue, Lockheed Martin, is the incumbent at Annex 2. [* * *].

In 1995, the Base Realignment and Closure Commission directed the consolidation of EW test capabilities in the western United States to link the EW ground and airborne missile seeker test facilities with capabilities at the Air Force Flight Test Center. Other Air Force and U.S. Department of Defense policy initiatives also supported con-

solidation of EW test capabilities. Consistent with these government policies, defendant undertook the J–TECH procurement to consolidate into a single contract the [* * *] existing legacy contracts that provided engineering and technical services [* * *]. Defendant developed a two-phased competition for this procurement because the Contract contained both classified and unclassified work. After Phase II, defendant issued Evaluation Notices (EN) to each offeror and engaged in individual discussions addressing their proposal weaknesses. The offerors then made revisions before submitting their final proposals.

## II. Solicitation Requirements and Evaluation Procedures

On April 17, 2000, defendant issued Solicitation No. F42650–99–R–7213 (hereinafter referred to as the "Solicitation" or "Request For Proposals (RFP)") for a cost-plus-award fee/award term contract. The Solicitation provided that defendant would award the Contract for a three-month transition period followed by a one-year base period and four option years, plus ten additional years of possible award term extensions. Thus, the Solicitation contemplated a potential contract duration of fifteen years with anticipated revenue for the unclassified portion of the procurement totaling $1,548,653,037.

Also on April 17, 2000, defendant instituted Phase I of the Solicitation covering the unclassified part of the J–TECH procurement. Defendant required the offerors to meet certain mandatory security requirements before proceeding to Phase II. Moreover, only those offerors who were successful in their response to Phase I were authorized to participate in Phase II. On August 7, 2000, defendant released Phase II of the procurement, [* * *]. Defendant issued fifteen amendments to the Solicitation prior to January 5, 2001, the final date for the initial proposals. Defendant added a sixteenth amendment on March 5, 2001, after the start of discussions.

---

**3.** Each offeror in this procurement expected to rely on various subcontractors to help fulfill the expansive requirements of the Contract.

The Solicitation provided that defendant would award the Contract to the offeror whose proposal represented the best value to the government, based on the evaluation factors and subfactors. The Solicitation identified four evaluation factors: Mission Capability, Proposal Risk, Past Performance, and Cost. The first three factors were of equal weight and when combined, were significantly more important than Cost. Defendant desired, however, to award the Contract to the offeror who provided the greatest confidence that it would meet or exceed the requirements affordably.

Within the Mission Capability factor were five subfactors, the first four of which were equally weighted: Technical Performance; Program Management; Transition/Phase–In; Employee Retention and Attraction; and Small and Small Disadvantaged Business Participation. The Solicitation also identified various requirements for defendant to consider within each of the first four Mission Capability subfactors.[4] Defendant employed a color rating scheme to represent evaluation scores for the Mission Capability factor and its subfactors: BLUE = Exceptional; GREEN = Acceptable; YELLOW = Marginal; and RED = Unacceptable. Under the evaluation scheme set forth in the Solicitation, defendant did not assign separate color or risk ratings for the requirements within the Mission Capability subfactors. Instead, defendant used them to help compile the overall color rating and risk assessment for each subfactor.

With respect to the Proposal Risk factor, defendant evaluated the level of risk associated with each aspect of the offerors' proposed approach to meeting the Mission Capability requirements, down to the subfactor level. This risk assessment considered potential disruptions of schedule, increased costs, degradations of performance, and the need for increased government oversight, as well as the likelihood of unsuccessful contract performance. In accordance with the rating system established in the Air Force Federal Acquisition Regulation Supplement (AF-

FARS), the evaluators assigned a Proposal Risk rating of LOW, MODERATE or HIGH to reflect the risks and weaknesses associated with an offeror's proposed approach.

The Past Performance criteria reflected the requirements of AFFARS § 5315.305, which provided a confidence rating system based on the offerors' past and present performance: Exceptional/High Confidence; Very Good/Significant Confidence; Satisfactory/Confidence; Neutral/Unknown Confidence; Marginal/Little Confidence; or Unsatisfactory/No Confidence. An offeror's confidence rating assessed each offeror's demonstrated record of contract performance, with an emphasis on work experience relevant to the Mission Capability subfactors and the Cost factor. In addition to the past performance information provided in each offeror's proposal, defendant also considered information obtained through the Contractor Performance Assessment Reporting System (CPARS), a database of performance ratings for Air Force contracts; questionnaires tailored to the circumstances of the J–TECH procurement; and interviews with the program managers and contracting officers most knowledgeable about the performance of the offerors. In Phase I of the procurement, the offerors submitted detailed information on present and prior contract performance they believed to be relevant to this procurement. They updated this information for Phase II of the procurement.

As for the Cost factor, proposed costs were not controlling for source selection purposes, however, defendant apprised the offerors that this factor would still contribute substantially to the contract award decision. Defendant also advised the offerors that it would evaluate their proposals for cost realism to determine whether their offers were reasonable and realistic when compared to the government's most probable cost (MPC) estimates for each proposal. The government developed the MPC estimates throughout the procurement process and based them on the offerors' technical approaches and cost proposals. These estimates were further re-

---

4. As discussed in more detail below, the SSA used some of these requirements as discrimina-

tors when making his final award decision.

fined after defendant conducted individual discussions with each offeror. The Cost Team, in collaboration with the technical evaluators and advisors, derived the final MPC estimate after the evaluation of the final proposals. Defendant used the accuracy of an offeror's cost proposal in relation to the MPC to determine how well the contractor understood the technical requirements of the Contract.

Defendant conducted the evaluation of these four factors pursuant to the Air Force Source Selection Plan for the J-TECH procurement. This plan required the review to be performed by three separate evaluation teams: (1) a Technical Evaluation Team (TET) responsible for evaluating the technical information in the offerors' proposals; (2) a Contract/Cost Team in charge of analyzing cost and ensuring that offerors complied with the Solicitation terms and conditions; and (3) a Performance Risk Assessment Group (PRAG) responsible for reviewing the offerors' records of past performance in accordance with the requirements of the AF-FARS. Pursuant to the AFFARS, the TET and Contract/Cost teams together comprised the Source Selection Evaluation Team (SSET). The SSET and the PRAG presented the results of the technical and cost evaluations to the Source Selection Advisory Council (SSAC). The SSAC, in turn, had the responsibility to conduct a comparative analysis of the proposals and present a Proposal Analysis Report (PAR) and source selection decision briefing to the SSA. The ultimate award decision was made by the SSA and documented in a Source Selection Decision Document (SSDD).

## III. Initial Evaluation Results

In response to the Solicitation, plaintiff, JT3, and Offeror C[5] presented proposals for unclassified Phase I. By January 5, 2001, all three offerors submitted their Phase II proposals to the Air Force. On February 13, 2001, the SSET presented an Initial Evaluation Briefing to the SSA. The ratings for plaintiff in this briefing were perceivably

much better than those for JT3. For example, under the Mission Capability factor JT3 received Unacceptable or RED ratings and HIGH proposal risk in three of the five subfactors—Technical Performance, Program Management, and Transition/Phase-In. In contrast, plaintiff received Acceptable or GREEN ratings with LOW proposal risk in all subfactors except Small and Small Disadvantaged Business Participation.

As for the parties' cost proposals, the SSET concluded that both plaintiff's and JT3's were unrealistically low. JT3 proposed a total bid price of [* * *] while plaintiff's was much higher at [* * *]. Plaintiff also bid more labor hours in its original proposal than JT3. JT3 proposed a total of [* * *] labor hours while plaintiff predicted [* * *]. The evaluators concluded that JT3 even failed to provide a reasonable estimate of the man hours required to accomplish the J-TECH requirements [* * *].

With respect to the Past Performance factor, the PRAG assessed the offerors' prior work experience in two phases. Phase I considered past and present performance related to the unclassified program requirements. Phase II assessed past and present performance against all J-TECH requirements. To determine the relevancy of each past performance contract under each Mission Capability subfactor and the Cost factor, the PRAG used the following relevancy rating system: Not Relevant (N/R); Semi-Relevant (S/R); Relevant (R); or Very Relevant (V/R). Thereafter, the PRAG developed a matrix for each contract that was deemed a "possibly" relevant contract and assigned an adjectival rating for each Mission Capability subfactor and Cost. Overall, the PRAG evaluated 17 relevant contracts for plaintiff's team and 34 for the JT3 team. The difference in the number of reviewed contracts is attributable to the number of members on each team.

In the Initial Evaluation Briefing, the SSET also presented to the SSA the ENs that had been prepared for each offeror. Following the briefing, the SSA concurred in

---

**5.** The court has redacted the name of the third offeror per the Air Force's request. The court will therefore refer to this bidder as "Offeror C."

the SSET recommendation that discussions be opened with all three offerors. Thus, plaintiff and JT3 were included in the competitive range for purposes of discussions.

On February 20 and 21, 2001, the SSET began the formal discussion period by meeting individually with the offerors and providing them the results of the initial evaluation and all ENs that had been written as of that date. The SSET tailored the individual discussions to each offeror's proposal, and gave additional ENs to the parties based on these discussions. For the entire procurement, plaintiff received 57 ENs while JT3 was given 65.[6]

## IV. Final Evaluation Results

On April 25, 2001, the discussion period came to an official end with the release of the formal written request for Final Proposal Revisions (FPR). Defendant received the parties FPRs on May 6, 2001. For its FPR, JT3 submitted changed pages to its original proposal to ensure that "our proposal is accurate in detail and consistent with the results of discussions with the government, Evaluation Notices (EN) issued by the government, and JT3 responses to those Evaluation Notices."[7] JT3 set forth nine general categories of changes to its initial proposal including adjustments relating to "Compensation and Benefits," "Minor Corrections Based on EN Responses," and "Changes Due to AWD (Area Wage Determination) Revisions." In response to the ENs JT3 received in the Cost area, it increased its proposed cost by [* * *] from [* * *] to [* * *]. In its FPR, plaintiff's proposed cost also increased after discussions but only by [* * *] from [* * *] to [* * *]. In addition, plaintiff made minor changes to its proposal described as "refinements made to [CSC's] original submission as a result of discussions with the Government ...."[8]

On May 30, 2001 after the individual discussion process, the SSET presented its Final Decision Briefing to the SSAC and the SSA. In the briefing, the SSET assigned identical ratings to plaintiff and JT3 in all of the Mission Capability/Proposal Risk subfactors. JT3's Mission Capability ratings, therefore, improved from the initial evaluation since three RED/Unacceptable ratings changed to GREEN/Acceptable in the Technical Performance and Program Management subfactors, and BLUE/Exceptional in the Employee Retention/Attraction subfactor. Indeed, the only area in which the ratings now differed between plaintiff and JT3 was the Cost subfactor of the Past Performance factor, where plaintiff received a BLUE/Exceptional on relevant contracts and JT3 earned a GREEN/Acceptable.

After the May 30, 2001, briefing to the SSA, the SSET Chairperson and the SSAC Co-Chairpersons approved the SSET's PAR, which the Air Force Selection Procedures Guide required. The PAR was dated June 14, 2001. After considering the evaluations and various discriminators, the SSA signed the SSDD on June 15, 2001, and concluded that defendant should award the Contract to JT3 because its proposal presented the best overall value to the Air Force. Specifically, the SSA determined:

> JT3 provided a superior proposal in comparison to ... CSC.... This is substantiated through JT3's superior proposal for Technical Performance, Program Management, and Transition/Phase-In Subfactors when considering proposal risk. In addition, JT3's proposal provided advantages over CSC's ... for the Employee Retention/Attraction Subfactor.... Therefore, I have determined that JT3 was superior for the Mission Capability Factor. There were slight differences between the offeror's [sic] for the Past Performance and Cost Factors, but these differences were not significant discriminators in my final decision.... Based on my integrated assessment of all proposals submitted for J-TECH and the specified evaluation crite-

---

**6.** Plaintiff contends JT3 received a total of 72 ENs. This discrepancy is based, in part, on whether oral suggestions are counted as ENs. The court deems this discrepancy irrelevant for purposes of this opinion.

**7.** Administrative Record (AR) at 20,412 (JT3 Final Proposal Revision Executive Summary Of Changes).

**8.** AR at 15,271 (CSC Final Proposal Revision Volume II Change Pages).

ria, it is my decision that the proposal submitted by JT3 represents the best overall value to the Air Force. I therefore direct award of the contract to JT3.[9]

Defendant officially awarded the Contract to JT3 on June 15, 2001.

## V. Plaintiff's Protest Of The Procurement

On July 5, 2001, plaintiff filed a complaint and motion for preliminary injunction in this court seeking to void the contract award to JT3. JT3 moved to intervene on July 6, 2001, and the court granted its request by order dated the same day. After participating in a court sponsored telephonic conference, defendant agreed to stay performance of the Contract until December 1, 2001. Plaintiff then withdrew its motion for preliminary injunction. After defendant filed the administrative record, plaintiff submitted an amended complaint on August 17, 2001, asserting that defendant's best value determination was arbitrary, capricious and contrary to the record because it ignored plaintiff's strengths and failed to follow the Solicitation's evaluation and award criteria. Plaintiff seeks a permanent injunction, bid preparation costs, other costs and reasonable attorney's fees, and any other relief deemed necessary by the court.

On September 24, 2001, plaintiff filed a motion for judgment on the administrative record arguing: (1) defendant relied on unreasonable discriminators under the Mission Capability factor; (2) the SSA failed to recognize plaintiff's superiority in every level of the past performance evaluation; (3) plaintiff was prejudiced by defendant's conduct; and (4) plaintiff satisfies the elements mandating a permanent injunction. JT3 submitted a cross-motion for judgment on the administrative record on October 9, 2001, claiming that plaintiff's attacks on the SSA's decision lack merit and that plaintiff was not prejudiced. Defendant filed its own cross-motion on October 11, 2001, arguing that the SSA's determination was rationally based. During a telephonic conference conducted by the court on October 29, 2001, defendant agreed to stay performance of the Contract for an additional 30 days to compensate for delays caused by the government's requirement that all attorneys and court personnel involved in the case obtain a top secret security clearance. On Wednesday, November 28, 2001, the court conducted oral argument on the parties' cross-motions at a secure location in Washington, D.C.

## Discussion

Motions for judgment on the administrative record are treated in accordance with the rules governing motions for summary judgment. RCFC 56.1; *Nickerson v. United States,* 35 Fed.Cl. 581, 588 (1996), *aff'd,* 113 F.3d 1255 (Fed.Cir.1997). Summary judgment is appropriate when there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. RCFC 56(c); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Jay v. Sec'y, DHHS,* 998 F.2d 979 (Fed.Cir.1993). A fact is material if it might significantly affect the outcome of the suit under the governing law. *Anderson,* 477 U.S. at 248, 106 S.Ct. 2505.

The party moving for summary judgment bears the initial burden of demonstrating the absence of any genuine issues of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). If the moving party demonstrates an absence of a genuine issue of material fact, the burden then shifts to the opposing party to prove that a genuine issue exists. *Sweats Fashions, Inc. v. Pannill Knitting Co.,* 833 F.2d 1560, 1563 (Fed.Cir.1987). Alternatively, if the moving party can show there is an absence of evidence to support the opposing party's case, then the burden shifts to the opposing party to proffer such evidence. *Celotex,* 477 U.S. at 325, 106 S.Ct. 2548. The court must resolve any doubts about factual issues in favor of the party opposing summary judgment, *Litton Indus. Prods., Inc. v. Solid State Sys. Corp.,* 755 F.2d 158, 163 (Fed.Cir.1985), to whom the benefits of all favorable inferences and presumptions run. *H.F. Allen Orchards v. United States,* 749 F.2d 1571, 1574 (Fed.Cir.1984), *cert. denied,*

---

9. AR at 24,377 (SSDD).

474 U.S. 818, 106 S.Ct. 64, 88 L.Ed.2d 52 (1985).

The fact that both parties have moved for summary judgment does not relieve the court of its responsibility to determine the appropriateness of summary disposition. *Prineville Sawmill Co. v. United States*, 859 F.2d 905, 911 (Fed.Cir.1988) (citing *Mingus Constructors, Inc. v. United States*, 812 F.2d 1387, 1390 (Fed.Cir.1987)). A cross-motion is a party's claim that it alone is entitled to summary judgment. *A Olympic Forwarder, Inc. v. United States*, 33 Fed.Cl. 514, 518 (1995). It does not follow that if one motion is rejected, the other is necessarily supported. *Id.* Rather, the court must evaluate each party's motion on its own merit and resolve all reasonable inferences against the party whose motion is under consideration. *Id.* (citing *Corman v. United States*, 26 Cl.Ct. 1011, 1014 (1992)).

▆▆▆ The court reviews challenged agency decisions under the standards set forth in the APA. 5 U.S.C. § 706 (1994); *Impresa Construzioni Geom. Domenico Garufi v. United States*, 238 F.3d 1324, 1332 (Fed.Cir. 2001) (citations omitted). In particular, the court must determine whether the agency's actions were arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law. 5 U.S.C. § 706. A bid award may be set aside, therefore, "if either: (1) the procurement official's decision lacked a rational basis; or (2) the procurement procedure involved a violation of regulation or procedure." *Impresa*, 238 F.3d at 1332 (citations omitted). When the case at issue involves unique and sensitive information, the court must also "give due regard to the interests of national defense and national security and the need for expeditious resolution of the action." 28 U.S.C. § 1491(b)(3) (Supp.1996).

▆▆▆ When evaluating whether an agency official's actions were rational, the APA requires a "thorough, probing, in-depth review" to determine "whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 415–16, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971).

Contracting officials, however, may properly exercise wide discretion in their application of procurement regulations. *Electro–Methods, Inc. v. United States*, 7 Cl.Ct. 755, 762 (1985). In this regard, the court cannot substitute its judgment for that of the agency, even if reasonable minds could reach differing conclusions. *CRC Marine Servs., Inc. v. United States*, 41 Fed.Cl. 66, 83 (1998). "This deference is particularly great when a negotiated procurement is involved and is greater still when the procurement is a 'best value' procurement." *Bean Stuyvesant, L.L.C. v. United States*, 48 Fed.Cl. 303, 320 (2000) (citations omitted). "[I]n situations where the court must 'review technical matters that are within the agency's expertise, the highest degree of deference is warranted.'" *Id.* As long as a rational basis is articulated and relevant factors are considered, therefore, the agency's action must be upheld. *Bowman Transp., Inc. v. Arkansas–Best Freight Sys., Inc.*, 419 U.S. 281, 285–86, 95 S.Ct. 438, 42 L.Ed.2d 447 (1974). The "disappointed bidder bears a 'heavy burden' of showing that the award decision 'had no rational basis.'" *Impresa*, 238 F.3d at 1333 (citing *Saratoga Dev. Corp. v. United States*, 21 F.3d 445, 456 (D.C.Cir.1994)). Moreover, when a protestor is asserting a violation of regulation or procedure, "the disappointed bidder must show 'a clear and prejudicial violation of applicable statutes or regulations.'" *Id.* (citing *Kentron Hawaii, Ltd. v. Warner*, 480 F.2d 1166, 1169 (D.C.Cir. 1973); *Latecoere Int'l, Inc. v. United States Dep't of Navy*, 19 F.3d 1342, 1356 (11th Cir.1994)).

▆▆▆ In addition, "to prevail in a protest the protester must show not only a significant error in the procurement process, but also that the error prejudiced it." *Data Gen. Corp. v. Johnson*, 78 F.3d 1556, 1562 (Fed. Cir.1996). To establish prejudice, a protestor must demonstrate that but for the alleged error, there was a substantial chance it would have received the award. *Statistica, Inc. v. Christopher*, 102 F.3d 1577, 1581 (Fed.Cir. 1996).

Plaintiff maintains defendant's decision was arbitrary, capricious, an abuse of discre-

tion and not in accordance with the law because, under the Mission Capability factor, many of the discriminators the SSA used to support his assertion that JT3's proposal was "clearly superior" were directly contrary to the record. Plaintiff also alleges defendant placed an overriding emphasis on the requirements of classified [* * *], even though the Solicitation did not state its importance as an evaluation criterion. In addition, plaintiff asserts defendant relied too heavily on proposed costs and related issues. Plaintiff also argues defendant failed to undertake any meaningful comparative analysis of the Past Performance factor, in which the PRAG's evaluations overwhelmingly demonstrated plaintiff's superior record of past experience. Given the alleged "dead heat" nature of the overall evaluation ratings, plaintiff contends that, but for any of these errors, there is a substantial chance it would have received the Contract. Plaintiff further maintains all of the factors for permanent injunctive relief are in its favor.

Defendant asserts the SSA's decision was rationally based, and therefore, it is not the duty of the court to "step into the shoes" of the agency decisionmakers to re-evaluate the proposals. Defendant emphasizes that the SSA determined that four of the five Mission Capability subfactors actually favored JT3 over plaintiff. With respect to the Past Performance factor, defendant argues the SSA determined this was not a significant discriminator because all of the offerors received a rating of Significant Confidence. Defendant believes the court should not "second guess" this decision. Defendant also maintains plaintiff does not satisfy the four necessary elements to obtain injunctive relief.

JT3 argues the SSDD is a model of rationality, and it reflects the SSA's sound independent business judgment. JT3 contends that even though its final proposal was rated

equal to plaintiff's, defendant actually *ranked* JT3's proposal as either equal to or higher than plaintiff's in every subfactor and subfactor requirement under Mission Capability.[10] JT3 asserts these rankings prove the SSA's decision was rationally based on the record. With respect to the Past Performance factor, JT3 maintains that the SSA was not required to do a contract-by-contract assessment of prior work experience, and that he is entitled to rely on reports and analyses prepared by others.

## I. Mission Capability Evaluation

The Mission Capability factor was divided into five subfactors: Technical Performance, Program Management, Transition/Phase–In, Employee Retention and Attraction, and Small and Small Disadvantaged Business Participation. In the SSET's final evaluation, plaintiff and JT3 received identical ratings for each subfactor. The SSA, therefore, considered various discriminators[11] to determine which offeror presented the best proposal with respect to this area of the procurement. Plaintiff asserts the SSA's reliance on some of these aspects was arbitrary, capricious and contrary to law. Specifically, plaintiff challenges the following discriminators: (1) commanding knowledge of [* * *]; (2) "day one" mission readiness; (3) *superior cost accounting systems*; and (4) magnitude of overall cost adjustments. Defendant and JT3 contend the SSA reached a reasonable conclusion that was based upon the evaluation record.

## A. [* * *]

This element was one of five discriminators under the Technical Performance subfactor. It focused on the test and training discipline, operational doctrine and data quality (the "test and training/operational

---

**10.** JT3 emphasizes that the Air Force did not officially rank the offerors, however, the PAR and SSDD are replete with distinctions among the offerors' proposals demonstrating an advantage of one offeror over another. JT3 contends the SSET, SSAC and SSA used these distinctions to document the rankings of the offerors by rated issue. Plaintiff vigorously challenges JT3's assertion that there was a ranking system for the Mission Capability subfactors.

**11.** The parties sometimes refer to these discriminators as subfactors of the Mission Capability subfactors. To avoid confusion between the subfactors and what are essentially sub-subfactors, the court uses the term "discriminators" to denote the latter. The terms "element," "requirement," and "aspect" are also occasionally referenced to identify the same.

doctrine/data quality discriminator") of the offerors' proposals. Plaintiff maintains the SSA considered this element to be *the* significant discriminator justifying award to JT3 over plaintiff. Plaintiff cites the declaration of [* * *],[12] attached to defendant's cross-motion, as an example of how strongly defendant favored the [* * *]. Said declaration describes the uniqueness [* * *]. Plaintiff argues the SSA's decision is contrary to the evaluation record and the announced evaluation criteria because the offerors were told that defendant would not accord greater weight to the special requirements [* * *]. In addition, plaintiff asserts its proposal was superior to JT3's in this category.

▆ Plaintiff's argument focuses on two assertions: the SSA's decision was contrary to (1) the underlying evaluation record and (2) the announced evaluation criteria. As for the first claim, courts and the Comptroller General have held that an agency's source selection decision is invalid when the underlying evaluation record does not support it. *See, e.g., Latecoere Int'l, Inc.,* 19 F.3d at 1362; *ACS Gov't Solutions Group, Inc.* Comp. Gen. Dec. B–282,098 (2 June 1999), 99–1 CPD ¶ 106; *Morrison Knudsen Corp.,* Comp. Gen. Proc. Dec. B–270,703 (11 April 1996), 96–2 CPD ¶ 86. The court must uphold the agency's decision, however, if there is substantial evidence in the record to buttress the agency's findings. *Cole County Reg'l Sewer Dist. v. United States,* 22 Cl.Ct. 551, 556 (1991) (citations omitted).

To support its conclusion that the SSA's decision was contrary to the evaluation record, plaintiff emphasizes that JT3's initial proposal was evaluated as containing numerous deficiencies, weaknesses, and inadequacies under the Technical Performance subfactor. Plaintiff cites defendant's Technical Evaluator Worksheets of JT3's initial proposal, which state, in part:

> The offeror's proposed process/procedure is inadequate and does not address the training requirement that is associated with [* * *].... The offeror's proposal fails to demonstrate a complete understanding of the government's technical performance ... [and] sound technical processes/procedures to ensure system operability.[13]

Plaintiff insinuates, therefore, that JT3's final proposal should not have received such favorable ratings in this area because its initial offer was so poorly rated.

▆ Plaintiff's argument is unpersuasive because defendant's evaluation of JT3's initial proposal is irrelevant. *Northrop Grumman Technical Servs, Inc.,* Comp. Gen. Dec. B–286,012, B–286,012.2 (1 Nov. 2000), 2000 CPD ¶ 181.[14] Plaintiff fails to consider the changes JT3 made to its final proposal in response to its individual discussions with the agency. The evaluation of JT3's initial proposal provides no basis to conclude that plaintiff's final proposal was stronger than JT3's. *Id.*

▆ Plaintiff also compares the descriptions of the offerors' proposals that the evaluators provided when analyzing the test and training/operational doctrine/data quality discriminator to prove that the SSA's decision did not comport with the underlying record. Plaintiff cites provisions discussing JT3's proposal that use the words "good," "clear," and "adequate." [15] In contrast, plaintiff invokes phrases from the evaluation of its proposal that say "exceeds the government stated requirement" and "exceeds the expected performance in a way beneficial to the government." [16] Plaintiff concludes from this

12. [* * *].

13. AR at 21,908; 21,910–11 (JT3 Technical Evaluation Worksheets).

14. Decisions of the Comptroller General in procurement cases are not binding on this court, nevertheless, the court may accord deference to them in recognition of the expertise and role of the General Accounting Office in the resolution of contested procurement decisions. *Bean*

*Dredging Corp. v. United States,* 22 Cl.Ct. 519, 522 (1991) (citing *Honeywell, Inc. v. United States,* 870 F.2d 644, 647–48 (Fed.Cir.1989); *Howell Constr., Inc. v. United States,* 12 Cl.Ct. 450, 452 (1987)).

15. Memorandum Of Points And Authorities In Support Of Plaintiff's Motion For Judgment On The Administrative Record (Pl.'s Mot.) at 7.

16. *Id.* at 8.

comparison that the record proves its offer was superior to JT3's.

Plaintiff's citation of these various words, and its view of the weight accorded to them, does not present a persuasive argument. Contrary to plaintiff's assertions, the SSA's determination that JT3's proposal was superior with respect to this discriminator is supported by the agency record. The SSAC commented in the PAR that JT3:

> [D]emonstrated extremely strong knowledge of [* * *] operations and doctrine. They described in detail [* * *], and operational procedures used to maintain fidelity of the [* * *] operations in a test and training environment. Their approach to staffing the [* * *] demonstrated in-depth knowledge of the requirements, and they were able to provide a list of trained personnel who will be able to support this function. They demonstrate excellent knowledge of technical issues involved in [* * *].[17]

This description of JT3's proposal was contained in a comparative analysis section of the PAR illuminating the strengths and weaknesses of each offeror's proposal. It is this document, which was signed by the SSET chair and the SSAC co-chairs, that summarizes the comments and discussions encompassing all evaluation deliberations and assessments. *See* AFFARS Part 5315.308–90(d) (the PAR "document[s] the results of the SSET evaluation and ... provide[s] the comparative analysis of competitive offers. The PAR includes the integrated assessment" of evaluation factors). The SSAC concluded that JT3's offer was better than plaintiff's and Offeror C's with respect to test and training discipline and operational doctrine. Plaintiff received a superior rating in the area of data quality.

Within his reasoned judgment, the SSA concluded, based on this analysis in the PAR, that:

> JT3's strong software life-cycle support, their excellent systems engineering approach, their commanding knowledge of [* * *], their superior equipment life-cycle support, and their comprehensive, detailed

understanding of the challenges to achieve range interoperability clearly made the JT3 offer in this subfactor superior to that of CSC and [Offeror C].[18]

This decision was rationally based on the information provided to the SSA in the PAR. It was not contrary to the underlying agency record.

■■■ As for plaintiff's second claim, "[a]n agency shall evaluate competitive proposals and then assess their relative qualities solely on the factors and subfactors specified in the solicitation." FAR § 15.305(a) (2001). "[T]he government is not permitted to rely upon undisclosed evaluation criteria when evaluating proposals." *Acra, Inc. v. United States,* 44 Fed.Cl. 288, 293 (1999) (citing *Candle Corp. v. United States,* 40 Fed.Cl. 658, 663 (1998)). Indeed, "[w]here one factor is to have predominant consideration over the other factors, this should be disclosed to the offerors." *Isratex, Inc. v. United States,* 25 Cl.Ct. 223, 230 (1992) (invalidating an agency's procurement decision when the agency failed to alert offerors of the importance of one subfactor that was given much more weight than the others).

■■■ Frequently in close cases, however, a minor weakness or a single strength can become the determinative factor in an award decision. *Calspan Corp.,* Comp. Gen. Dec. B–258,441 (19 Jan. 1995), 95–1 CPD ¶ 28. The SSA's use of such discriminators does not change the prescribed evaluation factors. *Id.; Teledyne Brown Eng'g,* Comp. Gen. Dec. B–258,078.2 (6 Dec. 1994), 94–2 CPD ¶ 223. Moreover, a solicitation is not required to identify each element an agency is to consider during the course of evaluations when said element is intrinsic to the stated factors. *Bean Stuyvesant,* 48 Fed.Cl. at 321 (citing *T & S Products, Inc. v. United States,* 48 Fed.Cl. 100, 105 (2000) (quoting *Analytical & Research Tech., Inc. v. United States,* 39 Fed.Cl. 34, 45 (1997)); *ITT Fed'l Servs. Corp. v. United States,* 45 Fed.Cl. 174, 187 n. 20 (1999); *Forestry Surveys and Data v. United States,* 44 Fed.Cl. 493, 497 (1999)).

---

17. AR at 24,325 (PAR).

18. AR at 24,367 (SSDD).

Plaintiff contends the SSA's reliance on JT3's alleged commanding knowledge [* * *] was the lone "significant" discriminator in this "virtual dead heat" competition.[19] Plaintiff challenges the SSA's decision-making process by claiming he elevated the requirements of [* * *] to the level of an undisclosed evaluation factor. Plaintiff maintains this reflects a departure from the RFP's stated evaluation criteria, which commented that test and training discipline and data quality were also significant discriminators under the Technical Performance subfactor. At oral argument, plaintiff changed its argument and asserted that this discriminator only focused on data quality, and that operational doctrine and test and training discipline were merely aspects of data quality.[20]

Plaintiff cites a line from the SSDD to support its claim that the SSA placed an undue emphasis on operational doctrine:

> JT3's commanding knowledge of [* * *] was *a significant discriminator* in my decision in spite of the strong CSC proposal for this aspect of the Technical Performance Subfactor.[21]

The court concludes that plaintiff is misinterpreting the SSA's comments. JT3's commanding knowledge of this particular subject matter was important, however, plaintiff has provided no proof that it was *the* significant discriminator upon which the SSA based his award decision. The SSA never stated that this was the only discriminator he considered when making his final decision. It was merely an important aspect that added to the overall results favoring JT3's proposal. Plaintiff completely ignores the fact that the SSA identified five separate discriminators in connection with the Technical Performance subfactor, all of which were found to favor JT3's proposal. As discussed above, the evaluation record clearly shows that the intervenor's proposal was superior to plaintiff's in this area. The fact that one subfactor is selected as more valuable than another does not mean the relative weights of the evalua-

tion factors have changed. *Calspan Corp.*, Comp. Gen. Dec. B–258,441 (19 Jan. 1995), 95–1 CPD ¶ 28. "It simply means that one has become the discriminator between competing proposals." *Id.*

In addition, the court disagrees with plaintiff's comments at oral argument that this discriminator focused solely on data quality. It is true that Section M3.7.2.1.7 stated that defendant would consider an offeror's understanding of test and training discipline, operational doctrine, and skills to determine how well their proposal met the data quality requirements.[22] The court does not interpret this provision to mean, however, that an offeror's evaluation on data quality in general is more important than its rating for test and training discipline and operational doctrine, as plaintiff alleges. Indeed, this particular discriminator was most concerned with how well the offerors understood the test and training discipline and operational doctrine, because a strong understanding of these requirements was necessary to ensure data quality. The SSA concluded that JT3 had the best comprehension of these requirements. The mere fact that defendant rated plaintiff's proposal exceptional on how it would ensure data quality and data integrity does not mean this discriminator favors plaintiff. The SSA was well within his discretion when he determined that JT3's "extremely strong knowledge" of operational doctrine and test and training discipline tipped this discriminator in favor of the intervenor's proposal. As discussed above, there is sufficient evidence in the record to support the SSA's conclusion.

Moreover, there is no evidence in the record that defendant placed an undue emphasis on the unique requirements of [* * *]. Plaintiff cites the declaration of [* * *], which discusses the adverse impact a permanent injunction will have on the [* * *], as evidence that defendant was focused only on the needs of this facility at the time of the procurement. This declaration, however, does

---

19. Pl.'s Mot. at 10.

20. Transcript of Oral Argument (Tr.) at 37.

21. AR at 24,367 (SSDD) (emphasis added).

22. AR at 1388 (Section M3.7.2.1.7: "The offeror's proposal demonstrates a thorough understanding of test and training discipline, operational doctrine, and skills to meet customer data quality requirements.").

not support plaintiff's allegation because it is a document created long after the Solicitation procedures were complete and defendant had awarded the Contract. It does not reveal that defendant's sole focus of the procurement was to award the Contract to an offeror who possessed the requisite abilities to manage [* * *], as plaintiff alleges.[23]

In addition, defendant took steps to ensure that a particular Annex's requirements did not take precedence over others, by placing a member from each Annex on the TET. The TET's evaluation process required all of its members to reach a consensus with respect to an individual evaluation result.[24] The record reflects this process was strictly followed and documented throughout all phases of evaluation.[25]

■ Also, the fact that [* * *] does not render the procurement improper. Plaintiff asserts JT3 had an unfair advantage because of its [* * *]. This court has held that "an agency is not required to neutralize the competitive advantages some potential offerors enjoy simply because of their own particular circumstances rather than any government action." *WinStar Communications, Inc. v. United States*, 41 Fed.Cl. 748, 763 (1998) (citing *Madison Servs., Inc.*, Com. Gen. Dec. B–278,962 (17 Apr. 1998), 98–1 CPD ¶ 113; *MCA Research Corp.*, Comp. Gen. Dec. B–276,865 (29 July 1997), 97–2 CPD ¶ 33; *Versar, Inc.*, Comp. Gen. Dec. B–254,464.3 (16 Feb. 1994), 94–1 CPD ¶ 230 ("an offeror's competitive advantage gained through incumbency is generally not an unfair advantage that must be eliminated.")). "It is not unusual for an offeror to enjoy an advantage in competing for a government contract by reason of incumbency, and there is no requirement for agencies to equalize or discount such advantage." *Bara–King Photographics, Inc.*, Comp. Gen. Dec. B–253,631 (15 Sept. 1993), 93–2 CPD ¶ 169. Plaintiff itself enjoyed an "advantage" in two of the Annexes in which it was an incumbent. Its subcon-

tractor Lockheed Martin was an incumbent at yet another Annex. There is no evidence in the record that JT3's prior experience [* * *] was *the* reason it received the Contract.

■ The test and training/operational doctrine/data quality discriminator was a significant aspect of the parties' proposals the SSA relied upon when making his final decision, nevertheless, the SSA's actions did not result in elevating the requirements of [* * *] to the level of an undisclosed evaluation factor. The court concludes the SSA acted within his discretion to consider this as an important discriminator when making his final decision.

### B. *"Day One" Mission Readiness*

■ Under the Transition/Phase–In subfactor, the SSA considered how prepared each offeror would be on the first day of performance if awarded the Contract. Indeed, the Solicitation set forth as an evaluation factor "the offeror's ability to . . . ensure full continuity of mission support and contract performance on the required performance start date of the basic period."[26] It was very important to defendant that the transition to a new contractor would not interrupt the EW programs. Defendant also wanted to maintain most of the current employees working on the J–TECH projects. The SSA concluded that the day one mission readiness discriminator favored JT3. In particular, the SSA commented:

JT3 committed to hiring [* * *] of current incumbents, CSC expected to hire [* * *] from incumbent employees . . . . I have determined that JT3's plan and commitment offers a clear advantage to the government for retaining skilled incumbent personnel . . . . In summary, JT3's quantifiable commitment to hire a large percentage of incumbent personnel consistent with

---

23. It should be noted that knowledge [* * *]. AR at 536–37 (Technical Requirements Document, Annex 4).

24. AR at 197 (Agency Source Selection Plan).

25. AR at 21,879–24,041 (Agency's evaluation of the protestor's, awardee's, or other interested parties' offers, or other responses to the Solicitation, proposals, including supporting documents).

26. AR at 237 (Source Selection Plan).

a day one mission focus gave JT3 an advantage over CSC and [Offeror C].[27]

Plaintiff maintains that, although it proposed to keep only [* * *] of the current workers as opposed to JT3's offer to hire [* * *],[28] the SSA's decision was irrational because plaintiff's offer was "enforceable" while JT3's was not. [* * *]. Nowhere in the record, however, is the enforceability of the offerors' proposals discussed as a specific requirement. Plaintiff raises this argument because it believes its decision [* * *] that its offer was genuine, while JT3's offer was not supported by any such proposal. Plaintiff is correct that defendant first considered plaintiff's suggestion "attractive."[29] Upon further analysis, however, the SSAC concluded in the PAR that plaintiff's idea was unfavorable because "[* * *]."[30] Plaintiff's proposal to hire [* * *] of incumbents backed up with a [* * *] guarantee, therefore, in no way made plaintiff's offer better than JT3's. The SSA's decision to not accord greater weight to plaintiff's idea was indeed rational.

Plaintiff also challenges the SSA's determination that JT3 demonstrated a greater level of day one mission focus. Plaintiff maintains the TET assigned it and JT3 nearly identical ratings with respect to their commitment to assume the J–TECH mission support requirements on the first day of the Contract. These similar ratings are reflected in the PAR, the SSET briefing to the SSAC, and the SSAC's briefing to the SSA.

Despite plaintiff's assertions the ratings were not always identical. In fact, the SSET gave plaintiff a GREEN rating and JT3 a BLUE. It was not until later that the SSAC, upon deliberation, changed plaintiff's GREEN rating to the more favorable BLUE. Also, in the SSAC's evaluation comments reflected in the PAR, plaintiff was described as having an "outstanding" understanding of incumbent employee concerns while JT3's proposal was deemed "exceptional." According to the evaluation terminology set forth in the SSET briefing and in the PAR, an "exceptional" rating is better than an "outstanding" rating. In addition, the TET described plaintiff's plan for hiring incumbent employees as "excellent" while JT3 was granted the higher rating "exceptional."

There is ample evidence in the record, therefore, demonstrating that JT3's proposal ranked higher than plaintiff's. The SSA did issue plaintiff and JT3 the same BLUE rating for the Transition/Phase–In subfactor, nevertheless, the SSA's decision that the day one mission readiness discriminator within this subfactor favored JT3 was rationally based.

### C. Cost Accounting System

A comparison of the offerors' cost accounting systems was one of five discriminators under the Program Management subfactor for Mission Capability. The Solicitation required offerors to "propose[] an adequate cost accounting system capable of supporting the various Government cost accounting systems, and which is capable of providing accurate and timely cost reporting and responsible stewardship across all of the J–TECH ranges, . . . ."[31] The SSA concluded that this discriminator slightly favored JT3.

Plaintiff challenges the SSA's determination because a prior cost accounting analysis performed by the Defense Contract Audit Agency (DCAA) on EG & G's cost accounting system, which JT3 proposed to use in its performance of the Contract, labeled the system "inadequate in part." Plaintiff also cites the PRAG's finding that JT3's past performance ratings for cost accounting were "marginal" while plaintiff's had "no system deficiencies and no outstanding [cost accounting system] issues."[32] Plaintiff contends it was therefore irrational for the SSA to conclude that the cost accounting system discriminator favored JT3.

---

**27.** AR at 24,370 (SSDD).

**28.** Offeror C actually proposed an even higher amount—[* * *].

**29.** AR at 24,330 (PAR).

**30.** [* * *].

**31.** AR at 1916(RFP).

**32.** Pl.'s Mot. at 18 (citing AR at 22,565; 23,868; and 24,302).

■ Despite plaintiff's claims, the relevancy of the DCAA report is marginal at best. The DCAA's review finding EG & G's accounting system "inadequate, in part" was based on other contracts. In contrast, the evaluators for the procurement in this case rated JT3's cost accounting proposal adequate for the needs of this particular procurement.[33] Specifically, in the PAR the SSAC characterized JT3's cost accounting system as "fully capable of meeting the government's multi-level security requirements associated with protecting funding sources."[34] This court has held that even when past and present contracts are similar, two sets of evaluators can reasonably reach different conclusions. *SDS Int'l v. United States,* 48 Fed.Cl. 759, 772 (2001). Thus, notwithstanding the DCAA's determination, the evaluators for this procurement found JT3's cost accounting system adequate. The court will defer to their reasonable decision. Plaintiff's argument based on the DCAA report is unpersuasive.

■ Moreover, the evaluators determined that both plaintiff's and JT3's accounting systems were adequate for this procurement. Unlike JT3's system, however, the evaluators deemed plaintiff's proposal merely "capable of meeting multi-level security requirements"[35] associated with protecting funding sources. Relying on these PAR descriptions, the SSA determined that JT3's accounting system was "slightly superior." Since the SSA is accorded reasoned discretion when making this decision, *Bean Stuyvesant,* 48 Fed.Cl. at 320, the court concludes the SSA's decision was rational.

A more important issue related to this discriminator, however, is its role in relation to the four other discriminators under the Program Management subfactor. The SSA did not accord much weight to the cost accounting aspect because the two proposals were so closely rated. In the SSDD, the SSA determined that:

> JT3 offered the strongest proposal, when considering proposal risk, for program management. JT3's integrated initiatives for program management, realistic approach to the types and quantities of personnel skills, employee motivational concepts, and their superior cost accounting system ... were factors in my decision. Although JT3 was somewhat weaker with their response to the short-term/surge requirement, this was more than offset by their approach to organization and staffing.[36]

Plaintiff is placing too much emphasis on the minor issue of cost accounting. Based on all five discriminators, the SSA concluded that JT3 had an advantage with respect to the Program Management subfactor, even though both JT3 and plaintiff were given overall GREEN ratings and Low Risk assessments. The court sees no reason to overturn this reasonable decision made within the SSA's broad discretion.

### D. *Cost Adjustments*[37]

Pursuant to FAR § 15.404–1(d), defendant was required to conduct a cost realism analysis to develop the MPC of each proposal. According to the FAR, the MPC may differ from the proposed cost and "should reflect the Government's best estimate of the cost of any contract that is most likely to result from the offeror's proposal." FAR § 15.404–1(d)(2)(i) (2001). The MPC "is determined by adjusting each offeror's proposed cost, and fee when appropriate, to reflect any additions or reductions in cost elements to realistic levels based on the results of the cost realism analysis." FAR § 15 .404–1(d)(2)(ii). The MPC is used for purposes of evaluation to determine which offer presents the best value. FAR § 15.404–1(d)(i). The Cost Team calculated the MPCs for each proposal

---

**33.** The court acknowledges plaintiff's argument with respect to the PRAG's marginal past performance ratings for JT3's accounting system, however, the court believes these ratings are more applicable to the intervenor's Past Performance factor assessment as opposed to the adequacy of its proposal under the Mission Capability factor.

**34.** AR at 24,266 (PAR).

**35.** *Id.* at 24,274.

**36.** AR at 24,370 (SSDD).

**37.** Although Cost was a factor separate from Mission Capability, the cost issues plaintiff raises are related to the Mission Capability subfactors.

**314**

and then the SSET presented the results to the SSA and SSAC on May 30, 2001.

The SSA stated in the SSDD that "[t]here were slight differences between the offeror's [sic] for the ... Cost Factor[ ], but these differences were not significant discriminators in my final decision." [38] Indeed, the RFP made clear that cost would not be controlling for source selection purposes and that defendant would accord it less weight than the other factors.[39] Defendant would instead treat proposed costs as an indicator of how well each offeror understood the J–TECH requirements and the expense associated with defendant's technical proposal for fulfilling these requirements.

In particular, the RFP provided:

The offeror's proposed estimated costs shall *not* be controlling for source selection purposes. The total cost proposed will be evaluated through a cost realism analysis, by calculating a probable cost ("PC") (FAR 15.404–1(d)(2)) for the transition/phase-in, the basic requirement and all option periods, in order to determine if it is reasonable and realistic. This will include an evaluation of the extent to which proposed costs indicate a clear understanding of solicitation requirements and reflect a sound approach to satisfying those requirements .... Cost information supporting a cost judged to be unrealistically low and technical/management risk associated with the proposal will be quantified by the Government evaluators and included in the assessment of the offeror. When the Government evaluates an offer as unrealistically low compared to the anticipated costs of performance and the offeror fails to explain these under estimated costs, the Government will consider, under the applicable Proposal Risk subfactor, the offeror's lack of understanding of the technical requirements of the corresponding Mission Capability subfactor.[40]

Plaintiff argues that, although cost was not supposed to be a significant discriminator in the SSA's decision, the relative difference in the magnitude of the overall adjustments the

Cost Team made to JT3's final proposal versus plaintiff's when it calculated the MPCs accounted for at least four separate discriminators the SSA cited in favor of JT3. Specifically, plaintiff claims: (1) the SSA was wrong in his belief that JT3 proposed more manpower at higher skill levels; (2) the SSA's focus on plaintiff's purported "low wage rate philosophy" was unreasonable; (3) the SSA's assertion that plaintiff had a "non-escalation philosophy" was directly contrary to the record; and (4) the SSA failed to recognize that the magnitude of cost adjustments for "company unique" cost factors was dramatically greater for JT3.

Defendant contends these discriminators were not the underlying basis for the SSA's conclusion that JT3's proposal was better in these areas. Defendant adds that the SSA's statement that certain cost adjustment issues bolstered his confidence in JT3's proposal does not prove he acted irrationally. JT3 maintains that plaintiff is mischaracterizing the record and "missing the point."

### 1. Manpower Skill Levels

■ Two aspects that increased the SSA's confidence in JT3's proposal was the number of productive man-hours and the skill levels of personnel that it proposed. The SSA concluded in the SSDD that:

JT3's proposal was the most realistic with respect to the types and quantities of personnel skills required to accomplish J–TECH requirements. Both [Offeror C]'s and CSC's proposals reflected a less accurate estimation of the required types and quantities of personnel skills .... CSC proposed too few personnel at lower labor rates than required to accomplish the J–TECH requirements and had to be adjusted upward in the government's most probable cost. JT3's proposed labor, both in number and costs, was evaluated to be most consistent with the government's requirement and JT3's technical and management approach. This greatly increases my confidence in the JT3 overall understanding of the breadth and depth of per-

---

**38.** AR at 24,377 (SSDD).

**39.** AR at 1917(RFP).

**40.** *Id.*

sonnel skills required to accomplish J–TECH requirements.[41]

Plaintiff maintains the SSA's decision is not supported by the record because plaintiff proposed more productive man-hours than JT3 and provided a larger number of skilled personnel hours. Plaintiff relies on JT3's recommended number of full time equivalents (FTE) and proposed vacancy rates to show that plaintiff's proposal included a greater overall quality of productive man-hours.

When considering the number of proposed man hours, the SSA looked at two types: FTE and Man–Year.[42] The SSA was most concerned in this area of the procurement with whether an offeror's proposal was consistent with the government's MPC.[43] He concluded that JT3's was the closest to this standard because defendant made a greater adjustment to plaintiff's proposal to meet the MPC than it did to JT3's offer.

Specifically, defendant modified plaintiff's FTE estimates "upward by [* * *] FTEs in Annex 1, [* * *] FTEs in Annex 2 and [* * *] FTE in Annex 4 for a total annual FTE upward adjustment of [* * *] FTEs (total of [* * *] for all years), and an upward dollar adjustment of [* * *]."[44] In contrast, defendant adjusted JT3's "estimate upward by [* * *] FTEs per year in Annex 3 (Total of [* * *] for all years) and a dollar adjustment of [* * *] was applied."[45] Based on these modifications, the SSA concluded that JT3 proposed more FTE hours than plaintiff because, even though both parties underbid in relation to the MPC, defendant had to add less to JT3's offer than to plaintiff's to meet this standard.

As for the Man–Year adjustment, plaintiff did propose greater costs than JT3. This did not benefit plaintiff, however, because defendant was looking for consistency with the MPC. Defendant determined that "CSC proposed excessive labor [hours per man-year]."[46] In particular, plaintiff assumed an average productive Man–Year of [* * *] hours—a figure that was [* * *] than defendant's calculation of [* * *] hours.[47] Defendant, therefore, adjusted plaintiff's cost downward by [* * *]. In contrast, JT3 proposed a net productive Man–Year of [* * *] hours. This figure was lower than defendant's assumption, nevertheless, it was as consistent with defendant's assumption as was plaintiff's.[48] When considering both the FTE and Man–Year adjustments together, the SSA concluded that JT3's proposed labor was more consistent with the MPC. The record supports this decision. Plaintiff's argument that it proposed more man-hours is contrary to the evidence in the record.

In addition, to establish its claim that it proposed better skilled employees, plaintiff relies on a statement in the record indicating that it proposed a higher mix of "exempt" personnel than JT3.[49] Plaintiff asserts that in general, exempt personnel are better compensated and more senior than non-exempt personnel. Plaintiff concludes that the SSA's statement that it had "greatly increase[d] . . . confidence in the JT3 overall understanding of the breadth and depth of personnel skills required to accomplish J–TECH requirements"[50] is entirely based on premises not supported by the record. Plaintiff fails to provide evidence, however, that the exempt employees it proposed indeed possessed

41. AR at 24,369 (SSDD).

42. FTEs were the number of overall positions an offeror proposed while Man–Years were the number of positions an offeror proposed to fill at any given time.

43. AR at 24,369 (SSDD) ("JT3's proposed labor, both in number and costs, was evaluated to be the most consistent with the government's requirement.").

44. AR at 24,314 (PAR).

45. *Id.* at 24,310.

46. *Id.* at 24,313.

47. *Id.*

48. *Id.*

49. AR at 22,396 (Advisor Comments). "Exempt personnel" are those workers not covered by the Service Contract Act pursuant to 41 U.S.C. § 356 (1994). Accordingly, "non-exempt personnel" refers to workers whose employment is within this statute's scope. 41 U.S.C. § 351 (1994).

50. Pl.'s Mot. at 22.

higher skill levels than JT3's. Plaintiff merely relies on its assumption that since some employees were exempt, they were better. Without such evidence, plaintiff cannot prove that the SSA's decision was unreasonable.

## 2. Wage Rates

The SSA identified as another discriminator plaintiff's "low wage rate philosophy":

> [Both] offerors were given strengths associated with the commitment to match current range incumbent salaries and benefits; however, CSC's cost volume did not reflect this commitment entirely .... Since much of the incumbent workforce in the J–TECH range partnership is currently paid wages considerably above [Area Wage Determination] minimums, the CSC low wage rate and non-escalation philosophy compromised an otherwise exceptional retention proposal and elevated proposal risk.[51]

Plaintiff maintains the SSA's decision was not supported by the record because the TET had considered this part of plaintiff's proposal to be a strength. Plaintiff also asserts the government informed the offerors it would normalize their proposed wage rates since the current rates could not be disclosed due to their proprietary nature. Cost normalization involves the measurement of offerors against the same "baseline" when there is no logical basis for differences in approach, or when there is insufficient information available, thus leading to the establishment of a common "should have bid" estimate by the agency. *See, e.g., SGT, Inc.,* Comp. Gen. Dec. B–281, 773 (1 Apr. 1999), 99–1 CPD ¶ 77. "[T]he purpose of such an analysis is to segregate cost factors which are 'company unique'—depending on variables resulting from dissimilar company policies—from those which are generally applicable to all offerors and therefore subject to normalization." *Id.* Defendant was unable to provide the offerors the current wage rates during the competition because the incumbent contractors claimed this information was proprietary.[52] Defendant advised the offerors during discussions, therefore, that it would normalize their proposed rates if they were "too far out of bounds."[53] As a benchmark, the government evaluators looked for "fully loaded" labor rates that were equal to or greater than what the incumbent contractors currently paid their personnel. Defendant adjusted each offeror's proposal to ensure adequate compensation for exempt and nonexempt personnel.[54]

Plaintiff interpreted the government's instruction that it would normalize wage rates as meaning that an offeror's proposal would serve as a placeholder that the Cost Team would later normalize. Plaintiff argues, therefore, that it was unreasonable for the SSA to identify as a discriminator plaintiff's "low wage rate philosophy" because its proposal acted as a placeholder that defendant would later adjust. Plaintiff also asserts the purpose of this part of the procurement was to evaluate the offerors' commitment to meet or exceed the legacy contract wage rates. Plaintiff's offer was much lower than JT3's or Offeror C's, nevertheless, plaintiff still believes it reflected its intention to meet or exceed incumbent wage rates.

Contrary to plaintiff's assertions, the SSA's conclusion that plaintiff possessed a low wage rate philosophy is supported by the record. Plaintiff was well aware of the proprietary compensation rates it paid its incumbent workforce at Annexes 1, 2 and 3, yet it offered to pay these employees less under the Contract than what it presently compensated them. Indeed, defendant had to adjust plaintiff's rates upward by [* * *] for these three Annexes. This does not reflect an intention to meet or exceed incumbent wage rates. Also, there is no indication in the record that the cost proposals were to serve merely as placeholders.

Plaintiff further claims defendant engaged in unequal discussions with JT3 because it

51. AR at 24,371 (SSDD).

52. AR at 24,316 (PAR).

53. AR at 24,375 (SSDD).

54. The government viewed as a key element the employee retention and attraction of top quality management, technical and engineering personnel. Defendant adjusted the offerors' proposed wage rates to accomplish this goal.

issued the intervenor an EN asking it to modify its proposed wage rates while plaintiff received no such notification. This argument also is unpersuasive. An agency is expected to "tailor its discussions to each offer, since the need for clarifications or revisions will vary with the proposals." *WorldTravelService v. United States*, 49 Fed.Cl. 431, 439 (2001). After its first evaluation of the technical proposals, defendant provided JT3 an EN advising it to increase its suggested wage rates because its offer failed to meet "specified minimum performance requirements."[55] Plaintiff's initial proposal, however, was not rated inadequate, deficient or weak in this regard.[56] In fact, plaintiff originally stated in its technical proposal that it would "make job offers at wage rates and salary levels that are at least equal to the pay being enjoyed today by the incumbent employees."[57] Plaintiff's final cost proposal, however, did not coincide with this statement because it suggested salaries below the current rates.[58] The SSA used this inconsistency in plaintiff's final offer as a basis to conclude that plaintiff had a low wage rate philosophy. The evidence in the record supports this decision.

### 3. Escalation of Wage Rates

As quoted above, the SSA commented that "the CSC low wage rate and non-escalation philosophy compromised an otherwise exceptional retention proposal and elevated proposal risk."[59] Plaintiff maintains that it does not have a "non-escalation philosophy" and that the SSA's conclusion can not be traced to the underlying record. Specifically, plaintiff asserts that Section I–285 of the RFP incorporated by reference FAR § 52.222–43, which requires offerors to warrant that they have not included in any of their wage rates subject to the Service Contract Act (*i.e.*, rates for non-exempt employees) any amount that represents an escalation in rates beyond those for the basic term of the Contract. Plaintiff contends that during its pre-FPR briefing, the SSET specifically addressed the subject of escalation for non-exempt labor by indicating that it would normalize escalation for said labor using a "yet-to-be-determined" percentage for each year of the Contract.[60] Plaintiff maintains defendant assured it that the Air Force would make the appropriate adjustment by applying its chosen escalation rate to all proposals.[61] Accordingly, plaintiff included its un-escalated costs for non-exempt employees in its final proposal. Plaintiff argues, therefore, that the SSA's conclusion that it had a non-escalation policy was unfounded because the SSET asked plaintiff to maintain such a policy.

Plaintiff's argument overlooks, however, the fact that the government deleted FAR § 52.222–43 from the RFP in the Request for Final Proposal Revisions. Plaintiff admits it was well aware of this change.[62] Plaintiff cites nothing in the administrative record stating that defendant would not evaluate

---

55. AR at 4002 (EN to JT3); 25,700 (JT3 Initial Evaluation Debriefing).

56. AR at 25,628 (CSC Initial Evaluation Debriefing).

57. AR at 11,233 (CSC Initial Proposal Volume II).

58. The TET evaluation of the offerors' initial proposals was focused on their technical offers because the government's MPC was not yet mature and the cost evaluation was developed throughout the procurement process. When reviewing the initial proposals, the TET's evaluation of employee compensation was based on the wage commitments stated by the offerors, not the separate and ongoing activities of the Cost Team evaluation. Following the close of discussions, the evaluators engaged in a more integrated assessment of evaluation factors which, among other things, highlighted the difference between

plaintiff's technical and cost proposals. The evaluators discovered that plaintiff's cost proposal did not "match up" with its pledge in its technical proposal to meet or exceed current wage rates. The SSA ultimately concluded, based on this review, that this discriminator favored JT3.

59. AR at 24,371 (SSDD).

60. Pl.'s Mot. at 26 (citing initial Declaration of Phillip M. Gardiner).

61. *Id.*

62. Plaintiff acknowledges in its reply brief that § 52.222–43 was removed from the Solicitation. Plaintiff's Opposition And Reply To Defendant's And Intervenor's Opposition And Cross–Motion For Judgment On The Administrative Record (Pl.'s Reply) at 26.

escalation rates when reviewing final proposals. Again, it appears plaintiff misinterpreted the requirements of the procurement. Plaintiff's final proposal did not contain escalation for non-exempt personnel wage rates.[63] Based on the information provided to him, the SSA rationally concluded that plaintiff had no escalation policy for wage rates.[64]

### 4. Magnitude of Cost Adjustments

 As discussed above, there were various discriminators related to cost and the Mission Capability subfactors that the SSA considered when determining which offeror presented the best proposal. The costs themselves, however, were not a significant factor in the SSA's decision as he made clear in the SSDD: "Given these minor differences [between the most probable costs of the offerors], I have determined that cost was not a significant discriminator in my decision." [65] Nevertheless, the SSA did review the offerors' proposed costs, and how much defendant adjusted them to meet its MPCs, as a measurement of how well they understood the J–TECH requirements. From this analysis, the SSA concluded that JT3 held the better understanding of the Contract's requirements.

The SSA commented in the SSDD:

I note that there are differences in the amount of the dollar adjustments required to be made to the offeror's [sic] proposals: [* * *] for JT3, [* * *] for [Offeror C], and [* * *] for CSC. JT3 had the lowest percentage of adjustments in their proposal. This gave me increased confidence in their recognition of the effort required to perform the J–TECH effort.[66]

Plaintiff argues this assertion fails to differentiate between the amount of adjustments made for each offeror that are "company unique" from those which are generally applicable to all offerors and therefore subject to normalization. Plaintiff believes the costs that were normalized, such as proposed wage rates and their escalation, do not reflect a contractor's understanding of the procurement because such proposals were merely placeholders and somewhat arbitrary. Plaintiff states that if the court differentiates between the adjustments the Cost Team made concerning the level of effort proposed, which are company unique, from the modifications associated with the normalization of labor rates, which are not company specific, the adjustments to JT3's final cost proposal were in fact [* * *] than the modifications made to plaintiff's proposal.

This argument is unpersuasive. The rates and escalation the offerors proposed clearly provided information on how well the offerors comprehended the requirements of the procurement. For example, plaintiff's proposed wage rates were lower than what it currently paid its own employees at two of the Annexes.[67] Plaintiff proposed these rates despite the RFP's clear emphasis that employee retention and attraction was a very important part of this unique procurement.[68] Plaintiff did not represent that it had a clear understanding of this issue.

Indeed, defendant performed the wage rate normalization to determine probable cost, not to insulate offerors from indicating what they understood the Solicitation required to satisfy the Contract's requirements. The SSA appropriately considered all proposed costs when making his award decision. Percentages were calculated to reflect how many adjustments defendant made to each offeror's cost proposal. Defendant

---

63. AR at 15,726 (CSC Final Proposal Revision Volume III).

64. Interestingly, plaintiff changes its argument in its reply brief and says it did propose escalation rates for non-exempt personnel and that the evaluators were well aware of this policy. Pl.'s Reply at 26. A review of the record shows, however, that although plaintiff may have mentioned escalating wage rates to evaluators, it did not propose any type of escalation for non-exempt employees in its final offer. AR at 15,726 (CSC Final Proposal Revision Volume III).

65. AR at 24,376 (SSDD).

66. *Id.*

67. Apparently, plaintiff's proposed wage rates were also lower than what its subcontractor Lockheed Martin paid its employees at Annex 2.

68. *See, e.g.,* AR at 1916 (RFP § M3.7.2.4); 24,-276 (PAR) ("... to effectively transition to the J–TECH contract it is critical to retain a very high percentage of the incumbent workforce.").

adjusted plaintiff's proposal by [* * *] while it only modified JT3's by [* * *]. When reviewing these figures, the SSA decided that JT3 possessed the best understanding of the procurement since its proposed costs were changed the least. This was a reasonable conclusion.

In summary, this competition was a virtual dead heat when looking at the ratings of the five Mission Capability subfactors. The SSA had to rely on various discriminators, therefore, to distinguish the proposals. Plaintiff has failed to show how this decision-making process was arbitrary, capricious, an abuse of discretion, or not in accordance with the law. Plaintiff cannot prove that there was a significant error in defendant's Mission Capability evaluation.

II. Past Performance Evaluation

Plaintiff also maintains defendant's actions were arbitrary, capricious and contrary to law because it did not conduct a comparative assessment of the offerors' past performance. Specifically, plaintiff asserts the PAR did not contain such a review and the SSA failed to perform a detailed comparison of past contract work. Plaintiff contends that, if the SSA had compared previous work experience, he would have determined that the underlying aspects of the Past Performance factor provided discriminators favoring its proposal.

Defendant and JT3 argue that the PAR does contain the necessary comparative assessment. They also contend the SSA is not required to compare one offeror's specific contract work with another's because their contracts generally have different requirements.[69] Instead, they maintain the SSA properly reviewed the past performance evaluations to ensure their accuracy, and then made the requisite comparative assessment of the ratings issued by the PRAG. JT3 also emphasizes that, contrary to plaintiff's assertions, not all of the underlying aspects of

plaintiff's past performance evaluation were favorable.

The FAR requires agencies to evaluate past performance "in all source selections for negotiated competitive acquisitions expected to exceed $1,000,000" unless the contracting official determines it is not an appropriate evaluation factor for the procurement. FAR § 15.304(c)(3)(i) (2001).[70] This review of past performance must be a comparative assessment of relevant information. FAR § 15.305(a)(2)(i). The contracting official may use reports and analyses prepared by others when making his or her source selection decision. FAR § 15.308 (2001). An agency is accorded broad discretion when conducting its past performance evaluations. *SDS Int'l v. United States,* 48 Fed.Cl. 759, 769 (2001) (citing *Forestry Surveys and Data v. United States,* 44 Fed.Cl. 493, 499 (1999)).

The main issue the parties debate is whether defendant performed the proper comparative assessment of past performance. To decide this issue, the court must first determine what the required comparative assessment entails. Plaintiff maintains the PAR needs to contain an explicit section comparing past contract work.[71] Plaintiff also cites FAR § 15.308 for the proposition that the SSA must not only review the past performance ratings and evaluation record developed by the PRAG, but he or she must also compare each underlying assessment on all past contract work. Plaintiff alleges the SSA did not perform such a detailed analysis. Plaintiff, however, fails to cite any case law supporting its understanding of what a comparative assessment of past performance involves.

It is unnecessary for the court to determine the proper format for a PAR because the court concludes that the PAR in this case contained a sufficient analysis of past contract work. Indeed, approximately 19 pages are devoted to explaining the evaluations of each offeror's past performance.

69. Defendant equates this to an "apples versus oranges" analysis.

70. The contracting official must document his or her decision to not consider past performance. FAR § 15.304(c)(3)(iv).

71. Tr. at 20.

This discussion is then summarized in a paragraph concluding that all three proposals deserved a Significant Confidence rating and that "[a]ll the offerors can perform the effort based upon the past performance data analyzed by the PRAG." [72] Plaintiff argues that there should have been more discussion on past performance in Section IV entitled "Comparative Analysis" and that the lack of said discussion proves the PAR does not contain any comparative review for this factor. All that is considered in Section IV, however, is the Cost factor. Indeed, plaintiff admits that the comparative assessment for Mission Capability occurs in this document before Section IV.[73] Plaintiff is being disingenuous, therefore, when it claims that the analysis of Past Performance cannot be comparative because it occurs before this section. After reviewing the past performance analysis in the PAR, the court concludes it is sufficiently comparative to meet the requirements of the FAR.[74] Plaintiff's argument is unpersuasive.

■■■ In addition, the court does not interpret § 15.308 as requiring the SSA to conduct his own contract-by-contract comparative assessment. The FAR clearly states that the SSA "may use reports and analyses prepared by others" when making his or her source selection decision, as long as said decision represents the SSA's independent judgment. FAR § 15.308. The FAR also mandates that the SSA "*shall* . . . [c]onsider the recommendations of advisory boards or panels." FAR § 15.303(b)(5) (2001) (emphasis added). In addition, the Solicitation in this case specifically provided that "[t]o arrive at a source selection decision, the SSA will integrate the source selection team's evaluations of the evaluation factors and subfactors." [75] Thus, as long as the agency

evaluators conducted a contract-by-contract assessment, the SSA may rely on this evaluation without performing the same detailed analysis. The court concludes, therefore, that all the SSA is required to do is review the agency's evaluations of past performance, ensure their accuracy, compare the results, and then form his or her independent conclusion based on this information.

In the present case, the PRAG conducted an extensive analysis of past performance information for each of the sources identified in the Solicitation and the source selection plan. This analysis included reviewing questionnaires that broke down the Mission Capability subfactors and Cost factor into subareas for evaluation. There were four evaluation areas for Cost and, with respect to the Mission Capability subfactors, there were seven evaluation areas for Technical Performance, ten for Program Management, two for Transition/Phase–In, three for Employee Retention and Attraction, and two for Small Business. The PRAG also conducted interviews with the government program managers and contracting officers with knowledge of the offerors' performance. The Air Force CPARS provided further assistance to the PRAG.[76] The PRAG used the information it gathered to determine an overall confidence rating for each offeror. Both JT3 and plaintiff received a rating of Significant Confidence.

After reviewing the PRAG's evaluation record and the PAR, the SSA decided:

I conclude that there is significant confidence that JT3 will successfully perform the required J–TECH effort. . . . I conclude that there is little doubt that the CSC team could successfully perform the

---

**72.** AR at 24,307 (PAR).

**73.** Tr. at 30 ("Now, they don't actually call it section 4 for the mission capability factor, but at page 80, we have the beginning of the comparative analysis that clearly the Air Force understands needed to be conducted with respect to at least the mission capability factor.")

**74.** Indeed, the language used in the summary paragraph for Past Performance is the same as the language used throughout the Mission Capability analysis, which plaintiff admits is suffi-

ciently comparative. *See, e.g.,* AR at 24,324 (PAR) ("All of the offerors demonstrated ·sufficient understanding of the range environment . . . ."); 24,325 ("All three of the final proposals demonstrated an ability to fully comply with the TRD specification . . . ."); 24,329 ("All three offerors were rated BLUE (Exceptional) for the transition/phase-in subfactor.").

**75.** AR at 1913(RFP).

**76.** *Id.*

required J–TECH effort.... I agree with the "significant confidence" rating for all offerors.... I have determined that past performance is not a significant discriminator in this source selection.[77]

Plaintiff and JT3, therefore, received final identical ratings of Significant Confidence.

The SSA did not conduct his own separate evaluation of the offerors' prior contracts, a process that took the PRAG over a year to complete. Instead, the SSA performed an independent review of the PRAG report and the PAR before determining that the PRAG's ratings were appropriate.[78] When conducting this evaluation the SSA discovered, in contrast to what plaintiff alleges, various aspects of plaintiff's proposal that were marginal or weak. For example, with respect to past performance relevant to the Contract's Mission Capability subfactors, the SSA acknowledged, as did the PRAG, that plaintiff received two Marginal performance ratings for the Program Management subfactor.[79] These two low ratings, when added to the exceptional marks plaintiff received for the other past performance categories, caused the SSA to agree with the PRAG that plaintiff's proposal only merited a Significant Confidence rating as opposed to a High Confidence assessment.[80] This decision was rational as this court has held that a clear advantage an offeror enjoys in one area of past performance can be offset by deficiencies in other aspects of its prior work. *SDS Int'l*, 48 Fed.Cl. at 769. Indeed, plaintiff does not argue that it's rating should have been higher or that JT3's should have been lower.[81] Defendant evaluated JT3 as having no past performance weaknesses in the Mission Capability area, unlike plaintiff.[82]

Moreover, when all rated past performance contracts are considered, JT3 had [* * *]. Exceptional ratings compared to plaintiff's [* * *]. JT3 also had a higher percentage of Satisfactory ratings [* * *] than plaintiff [* * *] in the Mission Capability area of past performance.[83] The SSA took all of these evaluations into consideration when reviewing past performance and concluded that the PRAG's ratings were correct. Pursuant to the requirements set forth in the FAR, it was unnecessary for the SSA to conduct a more detailed analysis. His comparison of the findings in the PRAG report and the PAR were sufficient.

At oral argument plaintiff also challenged the SSDD claiming that the SSA did not properly document his comparative analysis in this document.[84] The SSDD contained a description of each offeror's past performance evaluations and then a summary paragraph with the SSA's conclusions. The court believes this summation is sufficient. The SSA appropriately described each offeror's past performance results in consecutive paragraphs. He then concluded, "[b]ased on the PRAG report and the comparative analysis in the PAR, I agree with the 'significant confidence' rating for all offerors."[85] The mere fact that the SSA did not compare the past performance evaluations in the same paragraph does not mean that he did not perform a comparative assessment, as plaintiff alleges. The SSA is not required to document every tradeoff he considered when making his decision. *See* FAR § 15.308.

Plaintiff further argues, however, that even if the SSA performed a comparative assessment, he should have considered as discriminators the underlying evaluations that led to the Significant Confidence ratings.

---

77. AR at 24,373–74 (SSDD).

78. *Id.* at 24,372–73. For example, the SSA questioned the SSAC co-chairs' decision to change Offeror C's rating from Confidence to Significant Confidence. The SSA commented, "there is a clear difference presented in risk between [Offeror C] and the other offerors due to the fact that [Offeror C] has no past experience on a range project of this magnitude." *Id.* at 24,373–74.

79. *Id.* at 24,373.

80. *Id.* at 24,373–74.

81. Tr. at 28.

82. AR at 24,297–98 (PAR).

83. *Compare* AR at 24,180 (JT3 Past Performance Ratings All Contracts); 24,296 (PAR) with AR at 24,189 (CSC Past Performance Ratings All Contracts); 24,300 (PAR).

84. Tr. at 30–31, 32.

85. AR at 24,374 (SSDD).

Plaintiff maintains the SSA used the underlying aspects of the Mission Capability subfactors as discriminators, and thus, should have given the same weight to the underlying past performance ratings. The SSA did not perform such an analysis because he believed the overall Past Performance factor was an insignificant discriminator.[86]

Unlike the Mission Capability factor, however, the Past Performance factor did not include specific subfactors. Also, the analysis focused on each offeror's individual prior contract work, which was not the same. Thus, JT3's favorable rating for one of its past contracts could not easily be compared to CSC's favorable rating for its own prior contract. The work performed and the contract requirements were different. It was rational, therefore, for the SSA not to use such ratings as discriminators because there was no clear way to analyze on the same "playing field" the prior work experience.

In contrast, the SSA could compare the offerors' proposals for the Mission Capability factor, and use the underlying evaluations as discriminators, because the offerors were addressing the same technical requirements. In these categories defendant could fairly determine which proposal best satisfied the needs of this unique Contract. Since Mission Capability focuses on the actual contract work, it was reasonable for the SSA to rely on its underlying subfactors as discriminators to determine which offeror presented the best proposal in this very closely rated procurement.

Moreover, plaintiff seems to forget that, even if the SSA should have considered the underlying past performance evaluations as discriminators, some of plaintiff's ratings were not favorable. These ratings could have been used as discriminators against plaintiff. The SSA has broad discretion to determine what is a discriminator and what weight he accords it. *See, e.g., Keane Fed'l Sys., Inc.,* 1998 WL 786902, *12 (Comp.Gen.) (a case involving one proposal rated "outstanding" under past performance and another rated "good." The Comptroller General upheld the agency's determination that this

was not a discriminator because "there is no basis for us to conclude that the minor concerns with respect to the awardees' past performance amounted to a material distinction. As a result, we cannot conclude that the agency improperly omitted a positive discriminator for past performance.").

In addition, even if the Past Performance factor had favored plaintiff, defendant would not be required to automatically award the Contract to it. Within its broad discretion, defendant still could have granted the Contract to JT3 based on the Mission Capability factors and subfactors, which clearly favored JT3 and could easily outweigh a favorable Past Performance rating for plaintiff. *See, e.g., Airwork Limited–Vinnell Corp.,* 2000 WL 1371007, *7 (Comp.Gen.) (involving a procurement where mission capability and past performance were rated equally. The Comptroller General concluded that, even if the protestor would have received a higher rating on Past Performance than the awardee, such a rating would not change the award decision because the awardee had higher ratings under two of the four Mission Capability subfactors.). Plaintiff, therefore, has failed to prove there was a significant error in the Past Performance evaluation.

## III. Injunctive Relief

Plaintiff has failed to show that the SSA's reliance on certain Mission Capability discriminators was irrational or unsupported by the underlying evaluation record. Plaintiff also has not established that defendant conducted an improper or insufficient past performance analysis. Plaintiff, therefore, has not met its burden to prove a significant error in the procurement process. It is therefore unnecessary for the court to consider the second part of the analysis discussed in *Data Gen. Corp.,* 78 F.3d at 1562 ("to prevail in a protest the protester must show not only a significant error in the procurement process, but also that the error prejudiced it.").

Moreover, in order to obtain permanent injunctive relief, plaintiff must succeed on the merits and prove that: (1) it will suffer irrep-

---

86. *Id.* at 24,373–74.

arable harm if the injunction is not awarded; (2) granting relief serves the public interest; and (3) the harm it will suffer outweighs the harm to the government and third parties. *United Int'l Investigative Servs., Inc. v. United States*, 41 Fed.Cl. 312, 323 (1998) (citing *FMC Corp. v. United States*, 3 F.3d 424, 427 (Fed.Cir.1993); *ATA Def. Indus., Inc. v. United States*, 38 Fed.Cl. 489, 505 n. 10 (1997)) (the "factors are the same as those considered for a preliminary injunction"). Plaintiff must demonstrate by clear and convincing evidence that it is entitled to injunctive relief. *Cincom Sys., Inc. v. United States*, 37 Fed.Cl. 266, 268 (1997).

Plaintiff has failed to succeed on the merits of this case because it has not shown that defendant's actions were arbitrary, capricious, an abuse of discretion, or not in accordance with the law. *See Impresa*, 238 F.3d at 1333 (the "disappointed bidder bears a 'heavy burden' of showing that the award decision 'had no rational basis.' "). It is therefore unnecessary for the court to analyze the other three permanent injunction factors. *See FMC Corp.*, 3 F.3d at 427 ("[T]he absence of an adequate showing with regard to any one [permanent injunction] factor may be sufficient, given the weight or lack of it assigned the other factors, to justify the denial."). Even assuming, *arguendo*, that plaintiff could succeed on the merits, the court concludes that injunctive relief would still be inappropriate in light of the [* * *] concerns this case presents.

Indeed, the general public is not aware of the [* * *] activities conducted in the J–TECH program, nevertheless, they have a strong interest that these programs proceed

effectively. This interest has been heightened by the recent terrorist events and the country's current war on terrorism. [* * *].[87]

The productivity of the J–TECH program will not continue, however, if the court delays the Contract any longer. Defendant has already experienced a loss of critical, uniquely skilled employees as a result of the uncertainty of the outcome of this procurement—a trend that seems likely to continue until the transition to a single contractor is complete.[88] The loss of present employees not only threatens the productivity [* * *]. As emphasized in the Declaration of [* * *]:

[* * *].[89]

The impact of delaying the transition period for the Contract will adversely affect the support required by this country's critical defense programs, thus creating possible severe national security ramifications during this unique time.[90] The potential harm, therefore, to defendant, the general public, and the nation as a whole far exceeds any harm alleged by plaintiff.[91] Because of these concerns, and in the sound discretion of the court, injunctive relief must be denied even if plaintiff could succeed on the merits, which it has not. *See Rockwell Int'l Corp. v. United States*, 4 Cl.Ct. 1, 6 (1983) (denying injunctive relief, even though the agency's procurement decision lacked a reasonable and rational basis, because of the urgent national defense interests involved in the communication systems at issue); *see also Cincom*, 37 Fed.Cl. at 269; *Southwest Marine, Inc. v. United States*, 3 Cl.Ct. 611, 613 (1983); *N.V. Philips*

---

87. *See* Declaration of [* * *] at ¶ 15.

88. *Id.* at ¶ 19.

89. *Id.* at ¶ 12.

90. *Id.* at ¶ 17.

91. The court acknowledges plaintiff's argument that it will be irreparably harmed if the Contract proceeds because it will lose more than [* * *] in potential award fees over the fifteen-year life of the contract, or approximately [* * *] per year. Plaintiff also is concerned that it will be [* * *] if the Contract is not enjoined because it may lose to JT3 approximately [* * *] of its employees at Annex 1. Despite plaintiff's assertions, however,

"procurement error coupled with loss of business does not necessarily require injunctive relief." *Hawpe Constr., Inc. v. United States*, 46 Fed.Cl. 571, 582 (2000). This court has also held that a potential loss of employees is not an irreparable harm. *OAO Corp. v. United States*, 49 Fed.Cl. 478, 480 (2001). Employee Retention and Attraction was an important subfactor under Mission Capability, so plaintiff was well aware that the awardee would attempt to retain the incumbent workforce at all [* * *] Annexes. A natural outcome of this procurement, therefore, was that the disappointed bidders would lose skilled incumbent employees to the awardee. Plaintiff's argument is unpersuasive.

*Gloeilampenfabrieken v. United States*, 1 Cl. Ct. 783, 784 (1983).

### Conclusion

For the above-stated reasons, plaintiff's motion for judgment on the administrative record is hereby DENIED. The cross-motions filed by defendant and JT3 are hereby GRANTED. The Clerk is directed to dismiss plaintiff's complaint. No costs.

IT IS SO ORDERED.